FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 1 8 2003 ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT:
EASTERN DISTRICT OF NEW YORK

---

JOHN DOCKERY and AARON REED,

         Plaintiffs,

-against- (S.I.)

B.J.K., INC., doing business as CHEM RX,

         Defendant.

---

**COMPLAINT**

Case No. **CV 03 5803**

Plaintiffs demands a trial by JURY

**SEYBERT, J.**

**LINDSAY, M.**

The plaintiffs allege, by counsel, as follows:

### JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq and 42 U.S.C. § 1981.

2. This Court has pendent jurisdiction over the plaintiffs' claims based on the New York State Human Rights Law, Executive Law § 290, et seq.

3. Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq, on November 5, 2002, the plaintiffs each filed charges with the United States Equal Employment Opportunity Commission.

4. On August 22, 2003, the United States Equal Employment Opportunity Commission issued to each plaintiff a Notice of Right to Sue pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

5. Venue is proper in this District under 28 U.S.C. § 1391.

6. Plaintiff JOHN DOCKERY was at all times mentioned in this complaint a

1

resident of the County of Nassau, State of New York.

7. Plaintiff JOHN DOCKERY is currently a resident of the State of North Carolina.

8. Plaintiff AARON REED was at all times mentioned in this complaint a resident of the County of Nassau, State of New York.

9. Plaintiff AARON REED is currently a resident of the State of North Carolina.

10. Upon information and belief, defendant B.J.K., INC., is a New York corporation with its principal place of business located at 750 Park Place, Long Beach, County of Nassau, State of New York.

11. The defendant does business under the name of Chem R X.

## FACTS

12. The defendant is a "closed-door pharmacy" (SIC 5122) which primarily sells to nursing homes, adult homes and other commercial concerns.

13. Upon information and belief, the defendant has approximately 60 employees.

14. For the time period relevant to this charge, the defendant employed plaintiff Dockery as a maintenance worker.

15. During plaintiff Dockery's tenure, the defendant moved it primary facilities from 3700 Oceanside Road West, Oceanside, New York, to 750 Park Place, Long Beach, New York.

16. On or about January 7, 2001, the defendant hired plaintiff Dockery.

17. On or about May 14, 2002, the defendant terminated plaintiff Dockery's employment.

18. When he was interviewed for a position with the defendant, plaintiff Dockery

discussed his various construction skills including his experience with electrical work, carpentry, plumbing, masonry, flooring, roofing, and welding.

19. When he was hired, plaintiff Dockery understood that his position would involve sweeping, mopping, cleaning bathrooms and removing garbage.

20. After he was hired, plaintiff Dockery performed the work he understood he was hired to perform as well as construction work, landscaping and stocking vending machines.

21. After he was hired, plaintiff Dockery was under the direct supervision of Scott, whose last name, plaintiff Dockery does not know.

22. After he was hired, plaintiff Dockery was also under the supervision of Mark Baldinger.

23. Upon information and belief, Mark Baldinger is one of two shareholders of the defendant, and the defendant's executive vice-president.

24. Plaintiff Dockery was and is qualified to perform the duties of his position in maintenance.

25. Plaintiff Dockery is black.

26. After he was hired, plaintiff Dockery began to be subjected to discrimination on the basis of his race.

27. He continued to be subjected to this discriminatory conduct until May 14, 2002, when he was terminated from his employment.

28. Plaintiff Dockery's termination is part of a pattern and practice of discrimination and retaliation.

3

29. The frequency and severity of the discriminatory conduct experienced by plaintiff Dockery was such that it created a hostile work environment.

30. When plaintiff Dockery complained of the discriminatory conduct, he was subjected to retaliation.

31. The discriminatory and retaliatory conduct came from Scott and Mark Baldinger as well as other employees and other employees of construction contractors hired by the defendant to do work at the defendant's new facility in Long Beach.

32. The discriminatory and retaliatory conduct experienced by plaintiff Dockery is a part of a pattern and practice of discrimination.

33. Plaintiff Dockery experienced this discriminatory or retaliatory conduct on at least a daily basis when he was working, and, often, many times during any particular working day.

34. For the time period relevant to this charge, the defendant employed plaintiff Reed as a warehouse worker.

35. In or about October 2001, the defendant hired plaintiff Reed.

36. On or about March 26, 2002, the defendant terminated plaintiff Reed's employment.

37. After he was hired, plaintiff Reed was under the direct supervision of Mike Turcelli.

38. After he was hired, plaintiff Reed was also under the supervision of David Baldinger.

39. Upon information and belief, David Baldinger is the brother of Mark Baldinger.

4

40. Plaintiff Reed was and is qualified to perform the duties of his position in the warehouse.

41. Plaintiff Reed is black.

42. After he was hired, plaintiff Reed began to be subjected to discrimination on the basis of his race.

43. He continued to be subjected to this discriminatory conduct until March 26, 2002, when he was terminated from his employment.

44. Plaintiff Reed's termination is part of a pattern and practice of discrimination and retaliation.

45. The frequency and severity of the discriminatory conduct experienced by plaintiff Reed was such that it created a hostile work environment.

46. When plaintiff Reed complained of the discriminatory conduct, he was subjected to retaliation.

47. The discriminatory and retaliatory conduct came from Mike Turcelli as well as other employees.

48. Plaintiff Reed complained of Mr. Turcelli's conduct to David Baldinger as well as a manager by the name of Scott.

49. The discriminatory and retaliatory conduct experienced by plaintiff Reed is a part of a pattern and practice of discrimination.

50. Plaintiff Reed experienced this discriminatory or retaliatory conduct on at least a daily basis when he was working.

5

51. Although the defendant employs many minority employees, the defendant tends to treat black employees, including the plaintiffs in a particularly abusive manner.

52. For example, plaintiff Dockery was generally prohibited from going into certain parts of the defendant's facility where customers would regularly be present because of his appearance.

53. Other employees were not similarly restricted from entering certain parts of the defendant's premises.

54. Upon information and belief, although company policy grants employees two weeks of paid vacation, black employees receive only one week of vacation.

55. Unlike other employees, black employees are questioned whenever they take coffee breaks or lunch breaks.

56. Unlike other employees who are permitted to chat while working, black employees are required to remain silent while working.

57. Scott behaved in such a way that indicated that he did not even want any employees saying hello to plaintiff Dockery.

58. Black employees are treated differently with respect to medical leave issues.

59. For example, when plaintiff Dockery wished to return from leave due to a non-job related hand injury, he was required to return full-time or not at all. In contrast, a Hispanic employee took leave due to a hernia injury. On returning, this Hispanic employee was permitted to return on a part-time basis.

60. Even though they were hired after plaintiff Dockery, other maintenance workers

6

who are not black were given keys and other equipment to permit them to perform their duties. In contrast, plaintiff Dockery was denied a set of these keys and the other equipment, having the effect of impairing his ability to perform his duties.

61. Upon information and belief, black employees are paid less than other employees with lesser experience and fewer skills.

62. Upon information and belief, when the defendant moved to its current location, many white employees received promotions and pay increases. Black employees were denied similar promotions or pay increases.

63. Upon information and belief, Mark Baldinger believes that black employees should not be placed in a superior position over other employees who are not black.

64. As a result of Mark Baldinger's beliefs, plaintiff Dockery was denied a promotion to the head of maintenance because no other maintenance worker is black.

65. While plaintiff Dockery and two other maintenance workers, who are not black, were assisting in construction at the defendant's new facility, Mark Baldinger observed plaintiff Dockery instructing one of the other maintenance workers on what to do. On observing this, Mark Baldinger began yelling at plaintiff Dockery.

66. Mark Baldinger was generally abusive toward plaintiff Dockery.

67. Mr. Turcelli was generally abusive toward plaintiff Reed.

68. For example, for a period of one week, Mark Baldinger required plaintiff Dockery to remain in a back room, and ordered plaintiff Dockery to remain in that room and not to leave, even to go to the bathroom.

69. Black employees are held to different performance standards than other employees. For example, employees who are not black may abuse leave time without consequence. On at least one occasion, Scott prevented plaintiff Dockery from even using available leave time in connection with the death of a relative.

70. As another example, employees who are not black are free to make and receive personal telephone calls. Black employees are likely to be subjected to verbal abuse for speaking on a telephone, even if job related.

71. The defendant generally encourages a work environment which is hostile towards black employees.

72. Mark Baldinger is generally hostile towards blacks.

73. Mr. Turcelli is generally hostile towards blacks.

74. For example, during a three month period while the new facility was being renovated, plaintiff Dockery was subjected to discriminatory treatment from electricians hired to perform some of the construction work. These electricians often referred to plaintiff Dockery as a "nigger." One electrician even threatened to cut plaintiff Dockery's throat. Plaintiff Dockery complained of this treatment to both Scott and Mark Baldinger. Upon information and belief, other contractors also informed Scott and Mark Baldinger of the electricians' discriminatory treatment of plaintiff Dockery. Scott and Mark Baldinger not only failed to address the situation but actually joined in the conduct, making jokes about plaintiff Dockery's complaints and making unflattering comments about black people in general.

75. For example, plaintiff Reed replaced another black employee by the name of

Hadrick Grey. Mr. Turcelli often referred to plaintiff Reed as "Hadrick," but he referred to no other warehouse employees as Hadrick.

76. When speaking to black employees, Mr. Turcelli would often refer to the black employee in terms of "you people."

77. A white employee by the name of Anthony on a number of occasions referred to plaintiff Dockery as a "nigger." Although plaintiff Dockery complained of this behavior to Scott, Anthony continued to refer to plaintiff Dockery as a "nigger."

78. Anthony would often leave unflattering drawings of plaintiff Dockery. Despite having knowledge of this practice by Anthony, the defendant failed to take any action to stop this behavior.

79. An employee by the name of Anthony on a number of occasions referred to plaintiff Reed as a "nigger." Although plaintiff Reed complained of this behavior, Anthony continued to refer to plaintiff Reed as a "nigger."

80. Sometime in 1991, there was an incident in which a black employee stole something from a car parked in the defendant's parking lot. As a result of the theft, this employee was terminated. However, after this incident, the hostility toward black employees not in any way involved in this incident increased. Mark Baldinger boasted about the termination of this employee in such a way as to indicate that his pride stemmed from stereotypes based on race.

81. At a company Christmas party after this incident of theft, Mark Baldinger told plaintiff Dockery that he was keeping an eye on plaintiff Dockery and that he wanted to "catch another one."

82. Around December 15, 2001, the discriminatory and retaliatory conduct to which plaintiff Reed was subject became worse.

83. After this incident, there was one incident where a white supervisor joked by asking whether he should leave his car open because a black might steal it.

84. After this incident, there have been a number of incidents in which female, white managers would openly discuss how they were purportedly afraid to drive in the area of the defendant's facility because this is an area in which most residents are black.

85. After the renovation of the new facility was completed, the defendant began to deny plaintiff Dockery opportunities for overtime, while other employees who were not black continued to be given opportunities for overtime.

86. After Scott hired another Hispanic as a maintenance worker, Scott put plaintiff Dockery on a part-time schedule.

87. Black employees were generally held to a different performance standard that other employees.

88. For example, warehouse employees who are not black could make mistakes in filling orders or shelving stock without consequence. If plaintiff Reed made a mistake in the performance of his duties, Mr. Turcelli would subject him to severe verbal abuse.

89. As another example, plaintiff Reed, as the only black employee in the warehouse, was the only employee assigned the job of dumping foul smelling material contained in intravenous bags.

90. As another example, plaintiff Reed, as the only black employee in the warehouse,

was disproportionately required to perform heavy lifting.

91. Unlike other warehouse employees assigned to do heavy lifting, while plaintiff Reed was assigned to do heavy lifting, if he requested assistance with the lifting, Mr. Turcelli would refuse plaintiff Reed any assistance.

## FIRST CAUSE OF ACTION

92. The plaintiffs repeat each allegation contained in paragraphs 1 through 91 as though fully set forth in this paragraph.

93. The conduct of the defendant constitutes an unlawful discriminatory practice under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq, the New York State Human Rights Law, Executive Law § 290, et seq, and 42 U.S.C. § 1981.

## SECOND CAUSE OF ACTION

94. The plaintiffs repeat each allegation contained in paragraphs 1 through 93 as though fully set forth in this paragraph.

95. In complaining of discriminatory conduct, the plaintiffs were engaging in conduct protected under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq, the New York State Human Rights Law, Executive Law § 290, et seq, and 42 U.S.C. § 1981.

96. In continuing to harass the plaintiffs after they had complained of discriminatory conduct, the defendant was engaging in conduct constituting retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq, the New York State Human Rights Law, Executive Law § 290, et seq, and 42 U.S.C. § 1981.

WHEREFORE, the plaintiffs ask for a judgment against the defendant for the following

relief:

    a.    A declaration that defendant has violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq, the New York State Human Rights Law, Executive Law § 290, et seq, and 42 U.S.C. §1981;

    b.    An injunctive directing defendant to reinstate the plaintiff with backpay;

    c.    Compensatory damages, including damages for loss of earnings, emotional distress, mental anguish, and other special damages;

    d.    Punitive damages under 42 U.S.C. § 1981;

    e.    Attorneys' fees and costs; and

    f.    Such other and further relief as may be just under the circumstances of this case.

Dated: October 13, 2003

DAVID M. LIRA  
Attorney for Plaintiffs  
595 Stewart Avenue  
Suite 510  
Garden City, NY 11530  
(516) 222-2777  
DL3873

12

## Certification Pursuant to 28 U.S.C. § 1746

I declare, certify, verify and state under the penalty of perjury that the foregoing is true and correct, except as to those matters stated under information and belief, in which case, I believe such matters to be true and correct.

*John Dockery*

13

## Certification Pursuant to 28 U.S.C. § 1746

I declare, certify, verify and state under the penalty of perjury that the foregoing is true and correct, except as to those matters stated under information and belief, in which case, I believe such matters to be true and correct.

_____

Aaron Reed